David G. RIES, Plaintiff–Respondent,

v.

Julie SHOEMAKE, as Personal Representative of the Estate of William McCleney, Defendant–Appellant.

No. SD 30667.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 14, 2012.

Robert Z. Oberzalek, Birch Tree, MO, for Appellant.

Raymond M. Gross, Gainesville, MO, for Respondent.

JEFFREY W. BATES, Judge.

David Ries (Ries) sued William McCleney (McCleney) for breaching a real estate contract and making fraudulent misrepresentations about the property. Following a bench trial, the court entered judgment in Ries' favor. Prior to the entry of judgment, McCleney died. Julie Shoemake, the personal representative of McCleney's estate (Appellant), was substituted as the party-defendant and has appealed the judgment.

Appellate review is governed by Rule 84.13(d) and the principles set out in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). "We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Salem United Methodist Church v. Bottorff*, 138 S.W.3d 788, 789–90 (Mo.App.2004). We review the evidence and all reasonable inferences in the light most favorable to the judgment, and we disregard all contrary evidence and inferences. *Jackson v. Cannon*, 147 S.W.3d 168, 169 (Mo.App.2004). The credibility of the witnesses and the weight to be given to their testimony is to be determined by the trial court, which is free to believe none, part or all of the testimony of any witness. *Id.* at 169–70. The following summary of the facts has been prepared in accordance with these principles.

McCleney owned 170 acres of land located in Texas County, Missouri. He bought this property for the specific purpose of building a large lake on it. He built two interconnected lakes, approximately 15 acres in size, by placing two dams across three tributaries of the Big Piney River. One dam was 1,908 feet long, and the other was 1,560 feet long. McCleney believed that having the lakes on this property doubled its value. At some point prior to October 2003, McCleney applied for permits for the lakes from the Army Corps of Engineers (Corps) and the Missouri Department of Natural Resources (MDNR).

On October 8, 2003, McCleney received a letter from the Corps concerning his after-the-fact application for a Department of the Army permit for the lakes. This letter stated that "it does not appear that the need for your project justifies the impacts associated with the project." The letter also stated that, in order to obtain a permit, McCleney would have to either reconstruct the lakes in an upland area away from the stream channels or construct smaller lakes to minimize the impact to the three tributaries.

On January 30, 2004, McCleney received a certified letter from the MDNR notifying him that his request for an after-the-fact permit from that agency had been denied. The letter explained that mitigation for the loss of aquatic stream resources was required and could well be increased over the normal, minimum requirements due to the after-the-fact nature of the work. The letter then stated: "*A complete mitigation plan is required before a certification can be made.* Since you have not provided such a plan, your request for 401 certification must be denied." (Underlining in original.)

Ries, who lived in Minnesota, was interested in purchasing real estate in Missouri. In May 2004, Realtor Pat Fletcher (Fletcher) was McCleney's real estate agent. Fletcher took Ries to see McCleney's property, which was listed at $335,000. Ries was interested in building a retirement home overlooking the lakes. He was shown the property by McCleney, who pointed out five or six sites where Ries could build a house directly overlooking the lakes. During that showing, Ries did not observe any problems with the lakes. Both appeared to be full. McCleney said nothing about any problems with the lakes. Ries knew that, in Minnesota, a certificate or permit was required for dams and lakes. He wanted to make sure that McCleney had permits for the lakes if they were required in Missouri. Ries had looked at other similar properties in the area without a lake, and they were priced at between $900 and $1,000 per acre. Although McCleney's property was priced at over $1,900 per acre, Ries decided that he wanted to buy the property because of the lakes it contained. He believed that the lakes added approximately $160,000 in value to that property.

Prior to signing the real estate contract, Ries learned that the dams "leaked a little." McCleney told Ries that he had no reason to be concerned about the lakes. Ries agreed to fix these leaks himself if McCleney reduced the price by $10,000.

On May 24, 2004, Ries and McCleney signed a real estate contract in which Ries agreed to buy McCleney's property for $325,000. The contract contained a provision entitling the prevailing party to reasonable attorney's fees, litigation costs and court costs in the event a lawsuit was filed. An addendum to the contract stated, in relevant part, that McCleney was "to provide verification of permits for lake development and reveal any conditions, if existing." Ries wanted that provision included in the contract so that, "if there was a permit required, that [McCleney would]

take care of it." This language was drafted by Ries and Fletcher. At that point, Fletcher thought McCleney had the required permits. Both Ries and McCleney signed the addendum. If McCleney had not agreed to provide permits for the lakes, Ries would not have purchased McCleney's property. The same day the addendum was signed, Fletcher was told by McCleney that he intended to go to Kansas City on Wednesday, May 26th, and get the permit. Fletcher immediately sent a fax to Ries stating, in relevant part, that McCleney was "[m]eeting w/ lake permit lady Wed."

On Thursday, May 27th, Fletcher met McCleney on his property. He said the permit hearing went well, and the only thing he needed to do to complete the requirements was to build a fence. McCleney showed Fletcher where the fence needed to be built. Based upon this conversation with McCleney, Fletcher sent Ries another fax. In relevant part, this May 27, 2004 fax stated: "[p]ermit hearing yesterday went well & a fence needs to be built by Mr. McCleney to complete requirements. He will do."

On June 17, 2004, Ries met with Sid VanderVeen. He was a soils expert who advised Ries about how to repair the leaking dams. When Ries asked whether the lakes were required to have permits, VanderVeen said that was not his area of expertise. Ries also called the Corps office in Kansas City, but he was not able to obtain any information about whether permits for the lakes were required.

The closing occurred on June 18, 2004. Ries asked McCleney about the lake permits. McCleney said that he was working on it, and he would make sure he did everything that needed to be done. During the closing, McCleney also signed an affidavit stating, in relevant part, that he had "received no notice from any public authority, requiring any improvement, alteration or change to be made in or about said property." Ries believed that McCleney would get the necessary permits. He was unaware that McCleney's requests for permits from the Corps and the MDNR had been denied, and McCleney did not disclose that fact.

On July 18, 2004, Ries received an 18–page fax from the Corps office in Kansas City. The fax included copies of the October 2003 Corps letter and January 2004 letter from the MDNR. This was the first time Ries became aware that McCleney's applications for lake permits had been denied before Ries agreed to buy the property. Ries immediately faxed the documents to Fletcher, and she discussed the matter with McCleney. McCleney said he would go to Kansas City and get the permit.

On September 23, 2004, Fletcher sent a fax to Ries. In relevant part, the fax stated: "Took the 18 pages re permits up to Marge at Texas Co Title today. She said she talked to [McCleney] this week & he was willing to do whatever to get these permits done."

Ries tried to get McCleney to obtain the permits for almost two years, but he made no effort to do so. The January 2004 MDNR letter caused Ries to believe that a heavy rain could cause the lower dam to fail and result in substantial damage downstream. A neighbor whose house and buildings were located within a few hundred feet of the lower dam also expressed concern about it. To avoid potential environmental damage and safety issues, Ries hired an excavator to breach the lower dam. This drained the water from both lakes. The excavator also moved part of the dam material away from an adjacent stream bed. This work cost Ries $63,000.

In July 2006, Ries filed suit against McCleney. The amended petition con-

tained a breach of contract count and a fraudulent misrepresentation count. Ries sought actual damages, punitive damages, court costs, attorney's fees and such other relief as the court deemed proper.

At trial, Ries testified that the loss of the lakes had reduced the value of his property by $160,000. He would not be able to get permits for the lakes without complying with a number of requirements. Ries' expert witness, David Cavender, was an environmental engineer. He had been asked to evaluate the lakes and determine what would be required to develop the necessary "complete mitigation plan" in order to receive permits. He testified about the following problems with the construction of the lakes. The dams were constructed without permits being issued. A small stream ran parallel to the foot of one dam. At flood stage, the stream could erode the base of that dam and create a safety hazard. Whole trees were left in place within the dam itself, which created the potential for leaks as the wood rotted. The face of one dam was too steep, which created erosion problems. The dams were constructed out of gravelly soil, which created leakage problems. The dams had a very large watershed, which created the potential that the dams would be eroded during flood events. Cavender also testified that Ries would not be able to obtain permits from the Corps and the MDNR unless a number of steps were taken to reconstruct the dams and mitigate their impact on the aquatic environment. Cavender opined that the necessary reconstruction and mitigation would cost Ries $741,401.

A bench trial was conducted in October 2009. In March 2010, the court entered an amended judgment in Ries' favor. The court made the following findings that are relevant to the issues presented in this appeal:

1. In the addendum to the sales contract, McCleney agreed to provide verification of permits for the existing lake system and to reveal any conditions, if existing.

2. Through correspondence and personal contact with representatives of the Corps and the MDNR, McCleney knew that there were problems with the lake system and that his requests for permits and certifications had been denied.

3. McCleney breached the sales contract by failing to provide verification of permits to Ries and by failing to reveal conditions of the lake that had been identified by the Corps and the MDNR.

4. At the time of closing, Ries was unaware of the aforementioned conditions of the lake system or that McCleney's application for permits and certifications had been denied. Ries reasonably relied on the provisions of the addendum and on McCleney's statements.

5. At the closing, McCleney made a material misrepresentation by signing an affidavit stating that he had received no notice from any public authority requiring any improvement, alteration or change to be made in his property. At the time McCleney signed the affidavit, he had received a letter from the MDNR notifying him that his certification and permit request had been denied and that an alteration in his property would be required.

6. Withholding the information contained in the MDNR letter from Ries was a material breach of the parties' agreement and was so willful and reckless as to be in utter disregard of Ries' rights.

7. The parties' contract provided that, in the event of litigation, the prevailing party was entitled to recover reasonable attorney's fees, litigation costs and court costs.

8. It would cost $741,401 to put Ries' property in the condition represented by McCleney.

9. The value of Ries' property was diminished by $160,000.

10. Ries was entitled to recover reasonable attorney's fees and litigation costs in the amount of $17,000.

The court awarded Ries $160,000 in actual damages to compensate him for the diminished value of his property, $17,000 for reasonable attorney's fees and litigation costs, and $60,000 in punitive damages. This appeal followed.

### Point I

■ Appellant contends the trial court erred in finding that McCleney breached the contract by not providing verification of permits to Ries. Appellant argues that: (1) the contract addendum only obligated McCleney to provide the lake permits if they existed; and (2) because he never obtained any such permits, he could not have violated his contractual obligation. We disagree with McCleney's interpretation of the relevant contract addendum. It stated that McCleney was "to provide verification of permits for lake development and reveal any conditions, if existing." The word "verify" means "[t]o prove to be true; to confirm or establish the truth or truthfulness of...." Black's Law Dictionary 1594 (8th ed.2004). As the trial court decided, the addendum language created two distinct obligations. McCleney agreed to "provide verification of permits" for the lake system, and he also agreed to "reveal any conditions, if existing." From the structure of the paragraph, we construe the "if existing" language to relate only to

McCleney's duty to disclose lake conditions. Even if that language is ambiguous, however, our decision would not change. If a contract is ambiguous, the court can look to parol evidence to determine the parties' intent. *See East Hills Condominiums Ltd. Partnership v. Tri–Lakes Escrow, Inc.,* 280 S.W.3d 728, 735 (Mo.App. 2009). Ries and Fletcher were the persons who drafted the addendum. They both testified that the intent of the aforementioned language was to require McCleney to obtain any required permits and certificates for the lake system. There was ample evidence, via Fletcher's testimony and the faxes she sent to Ries, that McCleney understood the addendum language in the same way. Point I is denied.

### Point II

■ Appellant contends the trial court erred in finding that McCleney made material misrepresentations about the lake system. Appellant argues that Ries either knew, or could have discovered, everything material about the lakes prior to the closing. We disagree.

■ Before the property was ever shown to Ries, McCleney knew that his applications for required lake certifications and permits from the Corps and the MDNR had been denied, and that substantial alterations to the property would be required to obtain such certifications and permits. McCleney did not disclose this information to Ries. Instead, McCleney told Ries that he had no reason to be concerned about the lakes. The contract addendum imposed an obligation upon McCleney to reveal any existing lake conditions. He failed to do so. Instead, he signed an affidavit falsely stating that he had "received no notice from any public authority, requiring any improvement, alteration or change to be made in or about said property." Ries testified that: (1) the

only lake condition of which he was aware prior to closing was that the dams leaked a little; (2) it was July 2004 before he became aware that McCleney's applications for lake certifications and permits had been denied; and (3) if he had known this information prior to closing, he would not have bought the property. The trial court believed Ries' testimony, and we defer to that credibility determination. *See In re Marriage of Dolence,* 231 S.W.3d 331, 333–34 (Mo.App.2007). "The trial court is free to believe all, none, or part of the testimony of any witness." *Youngberg v. Youngberg,* 194 S.W.3d 886, 889 (Mo.App.2006). Point II is denied.

### *Point III*

Appellant contends the trial court erred by awarding any damages to Ries. Appellant argues that: (1) Ries failed to prove any diminution in the value of his property; (2) Ries failed to plead that he was entitled to attorney's fees; and (3) punitive damages are not recoverable in a contract action. We find no merit in any of these arguments.

First, there was ample evidence to support the court's actual damage award for diminution in value. McCleney bought the property for the specific purpose of building a lake on it. He believed that the addition of the lakes doubled the value of that real estate. Ries had looked at similar properties in the area that lacked a lake, and they were priced between $900 and $1,000 per acre. McCleney's property was priced at $1,900 per acre. Ries bought McCleney's property because of the lakes on it, and Ries believed that the lake system added $160,000 in value to that property. His testimony was competent evidence on the issue of value. *See, e.g., Gateway Foam Insulators, Inc. v. Jokerst Paving & Contracting, Inc.,* 279 S.W.3d 179, 189 (Mo. banc 2009) (holding that the trial court could properly rely upon the owner's testimony concerning the before and after value of his property in assessing damages); *Youngberg,* 194 S.W.3d at 890 (an owner's testimony is competent evidence of value). That evidence was supported by McCleney's own testimony that the lake system doubled the value of the real estate.

Second, Ries was entitled to recover attorney's fees. He requested attorney's fees in his petition, and he presented evidence on this issue at trial. If a contract authorizes the payment of attorney's fees, the court must award them to the prevailing party. *See Turner v. Shalberg,* 70 S.W.3d 653, 656 (Mo.App.2002). Ries was the prevailing party below. The trial court is considered an expert in assessing the necessity, reasonableness and value of legal services. *In re Marriage of Cornella,* 335 S.W.3d 545, 557 (Mo.App.2011); *In re Fuldner,* 41 S.W.3d 581, 596 (Mo.App. 2001).

Third, Ries' petition included a breach of contract count and a fraudulent misrepresent on count. In the latter count, Ries alleged that McCleney's conduct "was [willful], wanton, malicious and so reckless as to be in utter disregard of the consequences to [Ries]." Appellant's argument implies that the trial court awarded punitive damages on the contract count. Based upon our review of the judgment, it is clear that the trial court awarded punitive damages on the fraudulent misrepresentation count. The recovery of punitive damages is authorized for this intentional tort. *See, e.g., Haberstick v. Gordon A. Gundaker Real Estate Co., Inc.,* 921 S.W.2d 104, 109–10 (Mo.App.1996); *Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 364–65 (Mo.App.1993); *Marler v.*

*House*, 637 S.W.2d 365, 368 (Mo.App.1982). Point III is denied.

### Point IV

██ Appellant argues that the trial court's award of punitive damages is not supported by the evidence and is against the weight of the evidence. We will review each argument in turn.

██ "Under Missouri law, a plaintiff is entitled to punitive damages if the plaintiff proves by clear and convincing evidence that the defendant's conduct was outrageous because of the defendant's evil motive or reckless indifference to the rights of others." *Gilliland v. Missouri Athletic Club*, 273 S.W.3d 516, 520 (Mo. banc 2009). The issue of whether there was sufficient evidence to support the trial court's award of punitive damages is a question of law that we review *de novo*. *See id.* In making that determination, "we view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto." *Alhalabi v. Missouri Dep't of Natural Res.*, 300 S.W.3d 518, 528–29 (Mo.App. 2009).

Viewed in the light most favorable to the judgment, there was sufficient evidence to support the punitive damage award against McCleney. As noted above, McCleney knew by January 2004 that his application for certifications and permits from the Corps and the MDNR had been denied, and that substantial alterations to the property would be required to obtain such certifications and permits. McCleney did not disclose that information to Ries. What McCleney did say to Ries was that he had no reason to be concerned about the lakes. McCleney was required by the contract addendum to reveal any existing lake conditions. He did not do so. At the closing, he signed an affidavit falsely stating that he had "received no notice from any public authority, requiring any improvement, alteration or change to be made in or about said property." The trial court made a specific finding that McCleney's conduct was so willful and reckless as to be in utter disregard of Ries' rights. That finding is supported by the evidence and is sufficient to sustain the punitive damage award. *See, e.g., Saddleridge Estates, Inc. v. Ruiz*, 323 S.W.3d 427, 433–34 (Mo.App.2010) (upholding a punitive damage award for fraudulent misrepresentation involving the sale of real property).

██ Appellant also challenges the punitive damage award on the ground that it is against the weight of the evidence. This argument fails because it was not properly presented or adequately developed. Evidentiary "weight" refers to probative value, rather than the quantity or amount of evidence, and is determined by the ability to induce belief. *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo.App. 2010). An "against the weight" challenge presupposes the judgment's evidentiary support, but challenges that evidence's probative value to induce necessary belief, and involves four sequential steps. The appellant must:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial

court's credibility determinations, whether explicit or implicit; and

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Id.* at 186–87.[1]  Here, Appellant relies upon evidence favorable to her position and ignores all of the evidence that supports the trial court's judgment.  By doing so, Appellant has robbed her argument of any persuasive value.  *Id.* at 188–89.  This Court is prohibited from assuming the role of Appellant's advocate by formulating and articulating reasons why the omitted favorable evidence is not substantial and is so lacking in probative value, compared to the totality of the evidence, as to be against the weight of the evidence.  *Id.* at 189.  Point IV is denied.

The judgment of the trial court is affirmed.

SCOTT, C.J., and FRANCIS, J., Concur.

---

[1] These steps recognize that, while we must consider contrary evidence in this type of review, we still defer to the trial court's credibility decisions and will find a judgment to be against the weight of the evidence only when we firmly believe the judgment is wrong. *Houston,* 317 S.W.3d at 186.